IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED
AUG 22 2016
DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

| | |
|---|---|
| ELIZABETH FRYBERGER | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE UNIVERSITY OF ARKANSAS- | ) |
| FAYETTEVILLE and | ) |
| BOARD OF TRUSTEES OF THE | ) |
| UNIVERSITY OF ARKANSAS, | ) |
| | ) |
| Defendants. | ) |

Case. No. CV 16-5224 PKH

## COMPLAINT AND JURY DEMAND

Plaintiff Elizabeth Fryberger comes before this Court and for her Complaint against the University of Arkansas and its Board of Trustees states and alleges:

### I.   INTRODUCTION

At all times described in this Complaint and relevant thereto, Plaintiff was a student at the University of Arkansas – Fayetteville. Plaintiff brings this action against the University of Arkansas-Fayetteville and the Board of Trustees, (collectively, the "Defendants") under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") and the Campus Sexual Violence Elimination Act, S. 128, 113th Cong. (2013), codified at 20 U.S.C. § 1092(f) ("Campus SaVE Act").

### II.   PARTIES AND JURISDICTION

1.   The University of Arkansas-Fayetteville ("UofA"), is the flagship campus of the University of Arkansas System and a public university located in Fayetteville, Arkansas.

1

2.      The Board of Trustees of the University of Arkansas (the "Board of Trustees") operates, governs, and has legal control and responsibility for the functions of the University of Arkansas-Fayetteville.

3.      Elizabeth Fryberger ("Plaintiff") was, at all times relevant hereto, a student at the University of Arkansas-Fayetteville.

4.      The University of Arkansas-Fayetteville receives federal funding and assistance and is therefore subject to 20 U.S.C. § 1681 ("Title IX").

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b) due to the events giving rise to this claim having taken place in this judicial district, and Defendants are residents of this judicial district.

### III.      BACKGROUND FACTS PERTINENT TO ALL ALLEGATIONS

#### THE DEAR COLLEAGUE LETTER

7.      Plaintiff incorporates and re-alleges paragraphs 1 through 6 as if fully set forth herein.

8.      The office responsible for the implementation, interpretation, and enforcement of Title IX is the Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE").

9.      The DOE was authorized by Congress to disseminate Title IX regulations to recipients regarding implementation, interpretation, and enforcement.

10.     The Dear Colleague Letter dated April 4, 2011 ("DCL") is a document authored by the OCR outlining Title IX compliance requirements of an educational institution.

11.    The DCL specifically outlines the requirements that educational institutions must follow pertaining to sexual harassment and sexual violence.

12.    The DCL states that due to the requirements of Title IX, "schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

13.    The DCL states, "A single instance of rape is sufficiently severe to create a hostile environment."

14.    The DCL acknowledges that "Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

15.    The DCL states that "the school's inquiry in all cases must be prompt, thorough, and impartial."

16.    The DCL addresses the role of the Title IX coordinator, including that they "should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel…"

17.    The DCL requires "[a]ny procedures used to adjudicate complaints or sexual harassment or sexual violence, including disciplinary procedures must meet the Title IX requirement of affording a complainant a prompt and equitable resolution."

18.    The DCL provides, "[t]he complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing. For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant."

3

19.     As also stated in the 2001 Guidance promulgated by the OCR, the DCL identifies elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution, including "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence."

20.     Further the DCL states, "[a]ll persons involved in implementing a recipient's grievance procedures (e.g. Title IX coordinator, investigators, and adjudicators) must have training and experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures."

21.     The DCL requires the fact-finder and decision-maker in Title IX cases have adequate training or knowledge regarding sexual violence.

22.     The DCL requires "grievance procedures [] specify a specific time frame" in which the school conducts the investigation, gives a response to both parties regarding the outcome of the complaint, and for the parties to file an appeal.

23.     With regard to notice, the DCL states, incorporating the Jeanne Clergy Act, 20 U.S.C. § 1092(f), "[b]oth parties must be notified, in writing, about the outcome of both the complaint and any appeal."

24.     The DCL acknowledges that FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student.

25.     The DCL considers critical to achieve compliance, "[a]n assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate."

26.     Remedies for the complainant might include, but are not limited to "[a]rranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record."

### QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE

27.     Plaintiff incorporates and re-alleges paragraphs 1 through 26 as if fully set forth herein.

28.     Questions and Answers on Title IX and Sexual Violence ("Q&A") "is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights (Apr. 29, 2014):

http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

29.     The OCR issued Q&A "to provide recipients with information to assist them in meeting their obligations... This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations."

30.     The Q&A provides: "If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities."

31.     The Q&A states "[i]f the school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment."

32.     With regard to elimination of a hostile environment, the Q&A provides: "If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize the imposing sanctions against the perpetrator, **without additional remedies**, likely will not be sufficient to eliminate the hostile environment and prevent recurrence as required by Title IX." (emphasis added).

33.     The Q&A requires "[b]oth parties must be notified, in writing, of the outcome of both the compliant and any appeal."

34.     The Clergy Act requires, and Family Educational Rights and Privacy Act ("FERPA") permits, postsecondary institutions to inform the complainant of the institution's final determination and any disciplinary sanctions imposed on the perpetrator in sexual violence cases…not just those sanctions that directly relate to the complainant.

35.     The Q&A states, "[w]hen a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred."

### UNIVERSITY OF ARKANSAS POLICIES AND PROCEDURES REGARDING SEXUAL MISCONDUCT

36.     At the beginning of the 2014-2015 school year, presentations to the University staff emphasized the need for employees to inform their supervisors and the Title IX office in event of violations.

37.     During the 2014-2015 school year, the University did not mandate sexual harassment training, primary prevention, or awareness programs for students.

38.     During the 2014-2015 school year, the University did not mandate sexual harassment training, primary prevention, or awareness programs for faculty.

39.     During the 2014-2015 school year, the University did not mandate sexual harassment training, primary prevention, or awareness programs for staff.

40.     From 2013-2016, the University struggled to maintain a permanent Title IX Coordinator.

41.     Upon information and belief, Monica Holland ("Holland") took the position on an interim basis in 2014 from Shannon Haupt who was hired in 2013.

42.     In September 2015, Nicole Ferguson ("Ferguson") succeeded Holland as an interim director.

43.     Thereafter, another interim director was appointed named Danielle Wood.

44.     In April, 2016, the University hired another Title IX director.

45.     The University Student Handbook for 2014-2015 ("Handbook") established Student Conduct and Disciplinary Procedures including "Special Procedures for Title IX cases."

46.     Under the Handbook's general "Disciplinary Proceedings" guidelines, the hearing timeline is given: Seven (7) business days for preliminary investigation before determination of whether to dismiss or proceed with disciplinary process, or as soon as possible thereafter; there exists no timeline in the Handbook for pre-hearing conferences; a formal hearing no more than twenty (20) days following the date of the pre-hearing, or as soon thereafter; and five (5) days after hearing, a decision will be made.

47.     According to the Handbook, a "hearing panel" for Title IX procedures will consist of a "mixed gender three-person committee of university hearing officers, all of whom have been trained in; [sic] sexual assault prevention and response…"

48.     The Handbook allows appeals of Title IX cases based on the following four grounds: "(1) the [] stated special procedures were not followed and that affected the hearing

7

outcome; (2) new evidence has become available that was not available during the time of the original hearing; (3) the sanction(s) imposed are outside the University's sanction range for such violations and/or not justified by the nature of the offense; or (4) an objective assessment of the evidence under the preponderance of evidence standard supports a finding of responsibility."

49.    With regard to appellate outcome, the handbook states that "[b]oth parties shall be informed of the appellate outcome rendered. In order to comply with FERPA, the letter will not include information considered part of the alleged victim's or Respondent's "education record" (as that term is defined by FERPA), or other information about sanctions that do not relate to the alleged victim."

50.    The Handbook states "[r]retaliation against a complainant, alleged victim (if different from the complainant), or any witness is, in itself, a violation of university policy and the law, and is a serious separate offense."

**IV.    FACTS PERTAINING TO WRONGFUL CONDUCT OF DEFENDANTS**

51.    Plaintiff incorporates and re-alleges paragraphs 1 through 50 as if fully set forth herein.

52.    In the fall 2014, Plaintiff was a 19-year-old female tennis athlete at the UofA.

53.    In August 2014, Plaintiff met Raymond Higgs ("Higgs"), a UofA track athlete and 2012 Olympian, through an online dating app. On a single occasion, the two had consensual sex.

54.    They maintained intermittent contact through text messages and upon information and belief, Higgs initiated fifteen of the sixteen conversations.

55.    Higgs later testified that by early October, he realized Plaintiff was not interested in a sexual relationship with him.

56.     Prior to October, 2014 Higgs was arrested three prior times by the University of Arkansas Police Department ("UAPD") for charges of aggravated assault, assault in the third degree against a female, and terroristic threatening.

57.     Two of these arrests were on the same day.

58.     Upon information, Higgs was also previously served with an order of protection against a female.

### THE ASSAULT

59.     On October 20, 2014, Higgs sexually assaulted Plaintiff in her dorm located in the Northwest Quad on the University campus.

60.     Higgs threw Plaintiff down on the floor, removed her pajama bottoms and underwear, and began trying to penetrate Plaintiff without her consent and against her protest.

61.     Higgs also demanded Plaintiff perform oral sex on him.

62.     After Higgs left the room following the assault, Plaintiff requested a meeting from the UofA Director of Clinical and Sports Psychology, Dr. Michael Johnson ("Dr. Johnson") for the following day.

63.     Early the next morning, Plaintiff spoke to Julie Martin ("Martin"), the tennis team trainer.

64.     Martin excused Plaintiff from team practice.

65.     Through text messages, Plaintiff confided to Martin that she was "kinda forced to have sex with someone last night."

66.     Plaintiff texted Higgs the morning after the assault asking him about what happened the night before. She told him "you were literally forcing me to do something I didn't want to do."

67.     Though he admitted he was drunk the night before, he denied forcing Plaintiff to do anything as he "didn't have a gun to [her] head making [her] do shit."

68.     Shortly after the assault, Plaintiff and a friend, Nicole, discussed that rumors were already circulating on the team about what happened to Plaintiff.

69.     Upon information and belief, speculation of "all sorts of scenarios," including pregnancy, were discussed at tennis team practice.

70.     Nicole mentioned that Coach Hegarty, the head women's' tennis team coach, was "being weird too."

71.     Plaintiff expressed concern about these rumors to Martin.

72.     Nicole observed from Coach Hegarty that he had been told by Martin that Plaintiff needed to be excused from practice but had not been told a reason.

73.     Thereafter, Coach Hegarty asked Plaintiff what was wrong.

74.     When he asked this, the Plaintiff was "in hysterics" to which he told her to "be an adult" and tell him what had happened even though Dr. Johnson had instructed her not to share that information (see Paragraph 85, *infra*).

75.     Nicole reported that Coach Hegarty "said something like, 'We all knew [Plaintiff] was a bit different."

76.     Coach Hegarty had previously told Plaintiff's parents that [Plaintiff] was "different."

77.     Over the next few days, as rumors continued to circulate among Plaintiff's team, Nicole told Plaintiff that Coach Hegarty was "all curious" about what was being said.

### THE INVESTIGATION AND RESPONSE

78.     After the assault, Martin told Plaintiff a complaint would have to be filed.

79.   Martin informed Holland, the interim Title IX Coordinator for the University.

80.   Martin told Plaintiff that Holland would be calling her that day, October 21st.

81.   A meeting was set with Holland for the afternoon of October 21st.

82.   At noon on the 21st, Plaintiff met with Dr. Johnson as she scheduled.

83.   According to Dr. Johnson, Plaintiff was "tearful through much of the session" and described feeling "confused" and "numb" following the assault.

84.   Plaintiff "was asked to make a follow up appointment (a) if she felt the need to and (b) after meeting with the Title IX office."

85.   Dr. Johnson told Plaintiff not to inform Coach Hegarty about what had happened to her.

86.   Plaintiff met with Dr. Johnson of her own initiative on at least two occasions, on October 21st and November 3rd.

87.   During these meetings, Plaintiff expressed "difficulty participating in her usual daily activities," poor sleeping habits, frequent headaches, and feelings of sadness and confusion.

88.   Plaintiff expressed concern to numerous people, including her friend and Martin, that the University would take Higgs's side in any dispute because of "his status" as a celebrated Olympic track athlete.

89.   Around 6:00 p.m. on October 21st, Plaintiff went to Willow Creek Women's Hospital ("Willow Creek") where she was examined for signs of injury and evidence of DNA.

90.   A nurse at Willow Creek reported the incident to UAPD.

91.   On or about October 22, 2014, Plaintiff was interviewed by Lt. Greg Foster ("Lt. Foster") at the UAPD station.

92.     On or about October 22, 2016, UAPD obtained waiver of a search warrant from Plaintiff and searched Plaintiff's room gathering a pair of pajama pants, a pair of panties, and a condom and wrapper.

93.     Lt. Foster spoke to Higgs at the UAPD station the following day.

94.     Higgs denied raping Plaintiff and stated that there was "no way a guy could force a girl" to perform oral sex.

95.     Lt. Foster "corrected" him on this point.

96.     Over the next few days, Martin checked in on Plaintiff through telephone text message asking if Holland had talked to the Plaintiff about counseling. Plaintiff said no.

97.     Plaintiff mentioned that she was not going to classes or eating and that she had "passed out."

98.     In late October, University psychologist Mary Wyandt-Hiebert ("Wyandt-Hiebert") called Plaintiff but informed her that she would be out of office and that Plaintiff should email her.

99.     When Plaintiff did so, Wyandt-Hiebert then instructed the Plaintiff to set up an appointment.

100.    On October 29, 2014, nine days after the incident, Holland informed Plaintiff via email that the University had enough information to proceed with a Title IX investigation.

101.    The next day, Holland emailed Plaintiff's mother saying she (Holland) was unable to meet with her that day. Wyandt-Hiebert was also out of the office.

102.    In emails with Plaintiff's mother, Coach Hegarty said he understood "the rules and laws in this type of situation" and that "there is absolutely zero [team] demand or pressure for [Plaintiff]," noting that Plaintiff was on a "GPA break" for the team already.

103.   At that point in time, Plaintiff was not aware that she had been placed on any such break, and had received no notice that such placement had occurred.

104.   Over the following months, several of Plaintiff's mother's emails to Coach Hegarty went unanswered, including an October 30th email asking whether Plaintiff was still on the team, a November 2nd email giving a status update on Plaintiff , and a November 13th email asking why Coach Hegarty kept asking whether others (Plaintiff's team mates) doubted if the assault happened.

105.   Upon information and belief, Plaintiff communicated her desire to continue with the team, however Coach Hegarty provided no encouragement or support to Plaintiff.

106.   When eventually told that Plaintiff's grades would not affect the team GPA, Coach Hegarty responded, "That's certainly good news. The team will be pleased. They are headed somewhere near a 3.5 as a group which is so impressive."

107.   In November, Plaintiff's mother emailed Ferguson, the then Student Affairs Case Manager, requesting her number.

108.   Ferguson responded, but the number did not work.

109.   Ferguson emailed Plaintiff's professors to express that Plaintiff was "having some difficulty."

110.   Emails between Ferguson and Holland reveal confusion about dealing with Plaintiff's professors, with Ferguson expressing concern about "flooding professors" with emails.

111.   On November 6, 2014, two weeks after being notified of the assault, the University sent Higgs a no-contact order regarding Plaintiff.

112.   On November 8th, Plaintiff's mother emailed various University administrators noting that Plaintiff was struggling, especially since she was still living in the dorm room where

13

the assault occurred. Despite concerns, the mother assured them that Plaintiff was not dropping out of school.

113.    In reference to Plaintiff's mother's email, Ferguson emailed another administrator saying, "This situation seems to be worsening."

114.    On November 10, 2014, the Plaintiff, still struggling and receiving virtually no team support, went to her out-of-state home to recover with family support.

115.    Holland emailed Plaintiff's mother about Plaintiff's on-campus housing, writing, "Hopefully. . . we can point you and [Plaintiff] in the right direct[ion] to look into these options further."

116.    After receiving an email from Plaintiff's mother indicating that Plaintiff was "not doing well," Wyandt-Hiebert emailed Plaintiff to "check on" her and remind her of on-campus counseling resources.

117.    On November 14, 2014, Ashley McNamara ("McNamara"), Program Coordinator for the Office of Student Standards and Conduct, contacted Higgs to meet about the case.

118.    Upon information and belief, McNamara and Higgs met to discuss the case on November 18th.

119.    On November 19, 2014, about twenty days after Plaintiff was told the Title IX was initiated, Ferguson was dedicated as the primary contact person for the case and all communication should be funneled through her.

120.    Despite this, Ferguson expressed concern about the case communications several times. In an email to Melissa Harwood-Rom ("Harwood-Rom"), the Dean of Students at the University, Ferguson writes that she is trying to get updates in about Plaintiff's case, "but they are coming in about twice a day (from both mom and [Plaintiff])."

121.    On November 20, 2014, Holland and Ferguson call Plaintiff and her mother informing them that they can petition each appropriate office for accommodations and submit to the Dean's office the petitions.

122.    Ferguson described the conversation in an email as "somewhat combative," adding "they agreed to this."

123.    In an early December email to a fellow University staff member, Ferguson, the Plaintiff's point of contact, said, "[O]ther than [Plaintiff], things seem pretty mild."

124.    At one point through the process, Ferguson forwarded an email from Plaintiff's mother to Harwood-Rom, McNamara, and Rachel Eikenberry ("Eikenberry"), Assistant Director of the Office of Academic Integrity and Student Conduct.

125.    McNamara responded asking, "Why does she [Plaintiff's mother] keep sending those things to you?" to which Ferguson answered, "I sincerely think she is not well… This whole case is odd."

126.    In November, 2014, Confusion arose in dealing with Plaintiff's classes while she was recovering.   Specifically, it was unclear to Plaintiff whether she should be handling the communication with her professors directly or whether an adviser was.  Upon information and belief, it was also unclear to professors how to coordinate any accommodations that were to be provided to Plaintiff, with a certain professor referencing that Plaintiff was not likely to pass his class given the circumstances.

127.    Plaintiff's mother emailed Ferguson saying Plaintiff had reached out to her Economics professor who had said he was "working with the caseworker."

128.    However, the following day, which was the last day to drop a course, Plaintiff's family and Ferguson exchange emails about the Economics confusion. Ferguson wrote to the

family, "I think [Plaintiff] needs to be very intentional in her correspondence with instructors. In her email, she will need to ask what work she can do remotely over the break, what assignments will be required of her prior to or after her return, and how and when the instructors would like to meet with her to schedule make up tests. I do not feel that any instructor is [sic] failing to communicate, rather, the communication is not answering questions that aren't being asked."

129.   Plaintiff dropped the Economics class on November 21st.

130.   Plaintiff's mother informed McNamara that Martin, Plaintiff's trainer, was unsure if she (Martin) would be able to make a character statement for Plaintiff for the hearing.

131.   Martin thereafter communicated to Plaintiff that the athletics department would not allow her to write character statement for Plaintiff.

132.   Despite Martin's guidance that she was not permitted to submit a character reference letter, Higgs' track coach was able to submit a character letter on Higgs' behalf.

133.   Higgs's track coach, Travis Geopfert, submitted a character letter on Higgs's behalf in early December, stating, "**Admittedly, Raymond has had documented issues of misconduct while here at the university**. . . I don't believe he's capable of physically hurting someone. . . It's my hope that this accusation will not prevent this young man from graduating from the University of Arkansas." (emphasis added). Nonetheless, Geopfert's letter added, "I do not want to integrate myself deeply into this matter."

134.   On November 24, 2014, one month after the assault, it was determined that there was enough information for Title IX hearings.

135.   Higgs and Plaintiff are notified of their preliminary hearing meetings.

136.   The message to Higgs stated, "During this meeting we will review the incident in question and the material which has been submitted as evidence."

137.   The message to Plaintiff said the purpose of her hearing was "to review your rights, explain the process, and answer any questions you may have."

138.   In late November, Plaintiff retained the services of an adviser, Laura Dunn ("Dunn"), the executive director of SurvJustice, a non-profit focused on sexual assault.

139.   Dunn sent an email to various school administrators, including University Chancellor David Gearhart, about Plaintiff's Academic and Living Accommodations as required by Title IX on November 26th.

140.   The email also expressed concerns about time delays because Higgs would be graduating the following semester.

141.   In response to Dunn's email, Eric Wood of the Office of Student-Athlete Success emailed his colleagues in the University Athletic Department stating, "In my opinion we let campus do what they do and we just be prepared to educate the family if they approach us about her athletic eligibility moving forward."

142.   Clayton Hamilton, Senior Associate Athletic Director, responded saying that he and Scott Varady ("Varady"), then the Associate General Counsel, were trying to determine the appropriate individuals to respond to Dunn about the accommodations.

143.   On December 1, 2014, Higgs had his first pre-hearing interview with Eikenberry.

144.   On December 3, 2014, both Higgs and Plaintiff received "Administrative Hearing Notification" letters.

145.   The two letters differed in where they stated a student may defer a decision of responsibility. Higgs's letter said he could defer "to the Title IX Administrative Hearing Panel" while Plaintiff's said a respondent could defer "to the Administrative Hearing Officer or the AUCB."

146.   Higgs had another pre-hearing interview with McNamara and Eikenberry present along with Amanda Bobo ("Bobo"), Coordinator for Residence Education, and Christopher Bryson ("Bryson") and Jennifer Conyac ("Conyac"), Associate and Assistant Directors of Student Standards and Conduct.

147.   On December 4, 2014, Dunn emailed Varady noting a provision of the Clery Act under which both the accuser and the accused "shall be simultaneously informed in writing of. . . the institution's procedures. . . to appeal the results of the institutional disciplinary hearing".

148.   Eikenberry had said that the appeal information would be provided after the findings.

149.   Dunn thereafter sought to clarify that it would be sent "with the finding itself."

150.   In response, the members of the University's attorneys' office emailed among themselves and concluded that they would send the notifications simultaneously.

151.   Plaintiff's mother asked McNamara and Holland if Higgs's past arrests would be part of his hearing.

152.   McNamara assured Eikenberry that she had never confirmed past incidences with Higgs and that she had told Plaintiff's family his history would not be released as it would violate FERPA.

153.   Eikenberry emailed McNamara about Plaintiff's mother's email, saying, "Do not respond."

154.   While communicating with Dunn, Tamla Lewis ("Lewis"), Associate General Counsel for the University, asked fellow University staff for thoughts on sending an email to Dunn that twice mentioned not wanting to engage in "debate" with Dunn.

155.     Eikenberry appeared to caution Lewis in response, writing, "Honestly I'm a little afraid to tick her [Dunn] off prior to the hearing. I don't want her to perceive me as being adversarial despite her own approach."

156.     Eikenberry expressed concern over strain in her office, mentioning conflicting meetings, booked schedules, and staff out of the office. She emailed another staff member saying, "This is a really tough time for us in our office. . . We […] have to resolve all open or pending cases prior to the semester ending so I can say definitively that everyone is completely booked."

157.     On December 11, 2014, the administrative hearing occurred, paneled by Bobo, Bryson, and Conyac. McNamara and Eikenberry are also listed as attending the hearing.

158.     Plaintiff is informed by Eikenberry that friends may not attend the hearing to "support [her] during this emotional time" because the University's hearings are closed. "Having individuals wait for you in the lobby is not allowed," the communication said.

159.     Some of the questions at Plaintiff's hearing would draw controversy. One panelist asked, "One question that we had was—and this is gonna sound kind of bad—but we're not perfect at reviewing medical records, and there was no reported bruising on the arms or anywhere else on your body outside of that pubic region. Is that accurate?"

160.     U.S. Senator Claire McCaskill, in reviewing footage of Plaintiff's hearing, would later criticize this question saying, "The guy tried to intimate that clearly she didn't fight hard enough when her arms weren't bruised; it wasn't enough that the thighs were bruised or the pubic area was bruised." McCaskill summarized the questioning at Plaintiff's hearing as "ignorant."

161.     U.S. Senator Kirsten Gillibrand, who also reviewed the footage, said, "They [the hearing panel] came across as extremely uninformed, not trained."

162.    Nonetheless, the hearing panel unanimously sided with Plaintiff, noting that Higgs's behavior was "highly concerning and a **significant threat toward the University community.**" (emphasis added)

163.    In addressing punishment, the panel's letter stated, "Considering the student's [Higgs's] prior disciplinary history, as well as his actions in this incident, the hearing panel determined the appropriate resolution to this case would be immediate expulsion."

164.    Both Higgs and Plaintiff are notified by letter of the result.

### The Appeal

165.    On December 17, 2014, Higgs appealed his expulsion.

166.    Higgs cited that he respected the hearing body's decision, and did not intend to return to the University of Arkansas. However, in his explanation note, Higgs focused on his status as an international student and his need for his degree "to be able to continue [his] career as a track professional here in the United States." He admitted, "I understand that my character here at the University has resulted into [sic] your decision to expel me from continuing. . . , but I would please, if you allow, like to receive my diploma considering these circumstances. Again, I apologize for my actions, but I hope you understand that I spent these five years here at the University of Arkansas working hard."

167.    Responding for Plaintiff, Dunn emailed Chancellor Gearhart arguing Higgs's appeal was not compliant with Appeal Procedures.

168.    Eikenberry responded, instructing Dunn to allow thirty business days for the appellate body and that her response will be allowed even though it is "inconsistent" with university policies because "the student is responsible for speaking on his/her own behalf."

169.    In early January, McNamara told Plaintiff's mother that she (McNamara) "know[s] it seems like a long time since the appeal submission, but the University was closed" from December 24th-January 2nd or 5th.

170.    McNamara reminded Plaintiff's family that the appellate body has "thirty business days or as soon as possible thereafter to render a decision."

171.    Because of the closure, McNamara explained that they had had only five business days thus far to respond to the appeal.

172.    Plaintiff's mother again reached out to Coach Hegarty about Plaintiff returning to the University.

173.    The mother expressed that Plaintiff would like to play on the team again but was unsure if the team would be supportive.

174.    Based on University records, and upon information and belief, Coach Hegarty did not appear to respond.

175.    In late January, over a month after the hearing, Plaintiff sent an email asking if a decision had been made on Higgs's appeal.

176.    A week after Plaintiff's email inquiry, Eikenberry informed Plaintiff that the appellate panel had upheld Higgs's expulsion.

177.    In an email to Harwood-Rom on January 26, 2015, Eikenberry mentioned that Plaintiff's mother had asked why Harwood-Rom had not contacted her (the mother) regarding a phone conference. Eikenberry told Plaintiff's mother "that many university officials had been out of the office sick or traveling." Eikenberry further referenced how Plaintiff's mother had mentioned the Athletics Department was not responding to calls or emails and that she (the mother) feared university officials had been instructed by the university attorneys not to contact her.

178.    On January 29, 2015, Higgs received a letter ("Appeal Decision Letter") denying his appeal but setting an expulsion date for the end of the semester on May 10, 2015, after he would receive his diploma.

179.    The Appeal Decision Letter told Higgs, "In light of the fact that you had successfully completed your graduation requirements at the University of Arkansas prior to the date of the hearing panel's decision, **we do not believe that imposition of the sanction of immediate expulsion is appropriate in this case,"** thus **denying** the hearing panel's recommendation. (emphasis added).

180.    The Appeal Decision Letter also indicated that Higgs was "prohibited from being on or attending any event on the University of Arkansas campus . . . for a minimum of three (3) years – until May 2018 – or until the complainant is no longer enrolled as a student at the University of Arkansas, whichever occurs first."

181.    The Appeal Decision Letter was signed by Chancellor Gearhart and Daniel Pugh, Vice Provost of Student Affairs, and a copy was sent to Eikenberry.

182.    That Higgs's expulsion would not be immediate, as requested by the panel, concerned Plaintiff, her family, and Dunn.

183.    The fact that the University would allow Higgs to return to the University so long as Plaintiff was not enrolled as a student, concerned Plaintiff.

184.    When Plaintiff's mother emailed McNamara about the fact that the Appeal Decision Letter "didn't mention anything about [Higgs's] diploma," she received a response from Eikenberry declining to release information about a student's "educational record" under FERPA.

185.    Dunn emailed Eikenberry on February 2, 2015 noting the outcome letter failed to find whether Higgs's appeal was made on permissible grounds; if the appeal had not been permissible, Higgs's sanction could not be suspended during the processing of the appeal.

186.    The Appeal Decision Letter also did not mention that retroactive sanction was allowed under the Student Handbook, Section D, Appeal Procedures.

187.    Plaintiff had requested retroactive expulsion in a phone conversation in early December.

188.    Dunn noted the possibility that Higgs was being allowed to "access loopholes within [the University's] policies to graduate and receive his diploma."

189.    On February 4, 2015, Lewis responded to Dunn's email and defended the May 10 expulsion date, noting, "While you state you requested to Ms. Eikenberry that the expulsion be made retroactive to the date of the alleged offense, the University was under no federal mandate to do so."

190.    On February 10, 2015, journalist Tyler Kingkade ("Kingkade") of *The Huffington Post* contacted Conyac, Lewis, and Laura Jacobs ("Jacobs"), then the Associate Vice Chancellor for University Relations, while working on a story about the sexual assault.

191.    Kingkade noted that though the University found Higgs responsible for rape, Higgs did not challenge the guilty finding, and the University upheld a sanction of expulsion, the University nevertheless "informed the victim this month the effective date of the expulsion would be May 10, 2015 – the day after commencement. In the meantime, Higgs would be allowed to continue classes while the victim does as well. In short, the school is punishing a student it found responsible for sexual assault with expulsion after graduation."

192.     Kingkade posed a series of questions about the expulsion's delay to Conyac, Lewis, and Jacobs.

193.     The next day, Jacobs responded to Kingkade regarding the January 29th Appeal Decision Letter saying "the previously transmitted letter had been sent in error and did not accurately reflect the decision on the student's appeal by the Chancellor and the Vice Provost for Student Affairs. . . The correct decision was communicated to both of the parties yesterday."

194.     Jacobs writes, "By all accounts, the chancellor was out of the office when the January 29th letter imposing May 10th as the effective date of expulsion was formatted and auto-penned. . . It was the wrong letter that was auto-penned and sent. While his calendar on that date shows appointments on campus that day, there are periods of time when he was away."

195.     The same day, Lewis, who had previously defended the May 10th expulsion date, sent a letter to Charles Duell at the prosecutor's office, noting, "The enclosed letter replaces the previous communication dated January 29, 2015, that was sent to the student/respondent in error."

196.     After Spring 2015, Plaintiff withdrew from the UofA.

197.     In early June 2015, Lewis emailed Gearhart regarding an upcoming episode of VICE on HBO that would feature Plaintiff's case.

198.     Gearhart forwarded the information regarding the upcoming VICE episode to Donald Bobbitt, President of the University of Arkansas System.

199.     Several days later, Ashok Saxena ("Saxena") messaged Gearhart and Dan Ferritor suggesting the release of a short pre-emptive piece emphasizing how seriously the University handles crime prevention and emergency response.

200.     Jacobs wrote a pre-emptive piece to the VICE episode.

201.    Saxena requested a copy of the writing so that staff could "rally around that if we are pulled into discussion."

202.    Plaintiff has undergone therapy weekly from October 2014 to present as a result of the sexual assault and actions of the Defendants.

203.    Other than therapy, Plaintiff has suffered other damages in an amount exceeding the minimum for Federal Diversity jurisdiction including, but not limited to: severe anxiety and emotional distress, expenses associated with moving and leaving the UofA, medical bills, loss of past and future wages, and the loss of the benefits of a college education.

## V.      COUNT I – DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX) AGAINST DEFENDANTS

204.    Plaintiff re-alleges and incorporates paragraphs 1 through 203 as though fully set forth herein.

205.    Defendants had actual knowledge of sexual harassment and discrimination toward Plaintiff at the hands of Raymond Higgs.

206.    Defendants had notice of Higgs history of prior violence.

207.    The responses, or lack thereof, by Defendants were clearly unreasonable in light of the known sexual harassment and discrimination.

208.    Plaintiff suffered discrimination in the form of sexual assault by a student-athlete and Defendants acted with deliberate indifference in the investigation and response to the allegation of rape by a female student against a male student.

209.    The discrimination and harassment was so severe and objectively offensive so as to bar Plaintiff's access to educational opportunities and benefits.

210.    Defendants' deliberate indifference resulted in risks to Plaintiff's safety and the loss of her ability to continue attending UofA.

211.   Defendants acted with deliberate indifference to known acts of harassment, sexual violence, and discrimination, including but not limited to all of the allegations outlined above.

212.   The acts of the UofA toward the Plaintiff evidencing deliberate indifference include, but are not limited to:

a.   The failure to address concerns of violent acts on campus by Higgs against other students, including a tendency of violence towards women;

b.   Dilatory acts after knowledge of the assault including but not limited to:  the delayed execution of a "no contact order"; the delayed opening of a Title IX case; delayed coordination of classroom accommodations, delayed addressing of Plaintiff's room assignment where the assault occurred;

c.   The failure to implement athletic policies that clearly set out the procedure for trainers, coaches, and student-athletes to follow when a student-athlete is the victim of sexual assault;

d.   UofA Tennis showing more concern for the Team GPA than the well being of the Plaintiff as a sexual assault victim;

e.   UofA Tennis coaches permitting rumor mongering among the team subjecting the Plaintiff to a hostile team environment;

f.   UofA Tennis coaches failing to directly contact Plaintiff over the course of her recovery to show any support for her and failing to coordinate any support from her team during the recovery;

g.   Showing more concern for rights of the accused, Higgs, than Plaintiff, the victim of sexual assault;

h.  Giving multiple pre-hearing meetings to Higgs and not equally affording the same to Plaintiff;

i.  Providing Higgs the opportunity to review evidence before the hearing and not equally affording the same to Plaintiff;

j.  UofA athletics Permitting Higgs' former coach to present a letter of support for purposes of the hearing but explicitly refusing to permit the Plaintiff the same.

k.  Using of an unqualified hearing panel to hear the Plaintiff's case;

l.  Permitting and hearing an Appeal by Higgs that lacked appealable grounds per institutional policy;

m.  Issuing a letter, signed by the Chancellor, stating Higgs's sanction was too harsh and delaying Higgs's punishment until after his graduation from the University (allowing Higgs to remain enrolled at least 4 months after the expulsion decision, and on campus during that time);

n.  Associate Counsel for the UofA defending delayed expulsion date arguing there was "no federal mandate" to retroactively expel Higgs;

o.  Only after inquiry by mass media outlet (ignoring a similar requests from the Plaintiff),  reviewing the appeal decision and again modifying the expulsion date of Higgs without informing Plaintiff and thus causing Plaintiff to believe Higgs was still present on campus;

p.  Claiming that the original appeal decision had been sent in "error" and signed without the Chancellor's approval; and

q.  Refusing to disclose to Plaintiff whether Higgs received his diploma or was still on campus after the appeal decision was modified.

27

## VI.   COUNT II – HOSTILE EDUCATIONAL ENVIRONMENT IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX) AGAINST DEFENDANTS

213.    Plaintiff re-alleges and incorporates paragraphs 1 through 212 as though fully set forth herein.

214.    Plaintiff was denied access to educational opportunities and benefits as a result of physical sexual harassment, assault, and sexual discrimination that were severe and objectively offensive.

215.    Defendants acted with deliberate indifference resulting in a hostile educational environment for Plaintiff forcing her to leave campus and lose her educational opportunities at UofA.

216.    Defendants only sanctioned Higgs to the extent that Plaintiff was an enrolled student, failing to protect the student body as a whole, thus creating a hostile environment.

217.    Defendants have deliberately failed to address the sexually hostile environment ongoing on campus that caused Plaintiff to suffer loss of educational and athletic opportunities and benefits, along with damages, including but not limited to lost future earning and loss of earning capacity; damage to and delays in her pursuit of higher education, trauma, emotional distress, fear and anxiety.

## VII.   COUNT III – VIOLATION OF THE CAMPUS SAVE ACT, codified at 20 U.S.C. §1092(f), AGAINST DEFENDANTS

218.    Plaintiff incorporates and re-alleges paragraphs 1 through 217 as if fully set forth herein.

219.    Defendants did not conduct a fair and impartial investigation of the Plaintiff's complaint.

220. Plaintiff's hearing was not conducted by officials who receive annual training on issues related to domestic violence, dating violence, sexual assault, and stalking and how to conduct an investigation and hearing process that "protects the safety of victims and promotes accountability."

221. Defendants wholly failed to conduct mandatory primary prevention and awareness programs for all incoming students.

222. Defendants deliberately failed to adhere to federal law in implementing the appropriate and required training for students and Title IX hearing officials that caused Plaintiff to suffer damages, including but not limited to damage to and delays in her pursuit of higher education, trauma, emotional distress, fear and anxiety.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants awarding: damages, punitive damages, costs of litigation including attorneys' fees and expert fees pursuant to 42 U.S.C. §1988; and other relief of which this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS.**

Respectfully submitted,
Elizabeth Fryberger, Plaintiff

By: _____

George Rozzell, Ark Bar 08032
Kristin L. Pawlik, Ark Bar 99177
KEITH, MILLER, BUTLER,
SCHNEIDER & PAWLIK, PLLC
224 S. 2nd Street
Rogers, Arkansas 72756
Phone: 479-621-0006
Fax: 479-631-6890
Email: grozzell@arkattorneys.com
         kpawlik@arkattorneys.com

*Attorneys for Elizabeth Fryberger*