UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ELIZABETH FRYBERGER                                                    PLAINTIFF

v.                                        No. 5:16-cv-5224

UNIVERSITY OF ARKANSAS;
BOARD OF TRUSTEES OF THE
UNIVERSITY OF ARKANSAS                                                 DEFENDANTS

<u>**OPINION AND ORDER**</u>

Before the Court are Defendants University of Arkansas and Board of Trustees of the University of Arkansas's (the "University") motion (Doc. 42) for summary judgment, brief (Doc. 44) in support, statement of undisputed facts (Doc. 43), and accompanying exhibits. Plaintiff Elizabeth Fryberger filed a response (Doc. 50) in opposition, a response to the University's statement of undisputed facts (Doc. 51), and exhibits in support of her response (Docs. 52 and 53). The University filed a reply (Doc. 54) and a response (Doc. 55) to Fryberger's statement of undisputed facts. The Court held a hearing on the motion on July 23, 2019. After reviewing the record and considering the parties' arguments at the hearing, the motion will be GRANTED in part and DENIED in part.

**I.      Background**

**A.      The Assault**

In the Fall semester of 2014, Elizabeth Fryberger was a student at the University of Arkansas in Fayetteville and member of the women's tennis team. Shortly after she arrived on campus, she met Raymond Higgs, another student-athlete, through an online dating app. Fryberger and Higgs had a consensual sexual encounter on one occasion prior to October 20, 2014. On the evening of October 20, Higgs went to Fryberger's dorm room located at the Northwest Quads.

1

Fryberger opened the locked doors and allowed Higgs to enter her dorm, escorted Higgs to her upstairs suite, and led him to her private dorm room. At some point that night, Higgs sexually assaulted Fryberger in her dorm room. After Higgs left her room, Fryberger immediately contacted Dr. Michael Johnson, the University's Director of Clinical and Sports Psychology, and requested a meeting for the following day.

### B.    The University's Response

The next morning, October 21, 2014, Fryberger contacted Julie Martin, a trainer for the women's tennis team, and asked to be excused from practice that day. Fryberger confided in Martin through a series of text messages and described the assault. Martin excused Fryberger from practice. Martin offered support and discussed Fryberger's options going forward, such as reporting the assault to the police and University administration. Martin then contacted Monica Holland, the interim Title IX Coordinator, and reported Fryberger's allegation of sexual assault. Martin contacted Fryberger periodically in the days following the assault to inquire about her well-being.

At noon that day, Fryberger met with Dr. Johnson. Fryberger told Dr. Johnson she had been the victim of a sexual assault. Dr. Johnson provided counseling and treatment. Dr. Johnson told Fryberger to make a follow-up appointment if she felt she needed to meet with him again.[1] Fryberger acknowledges that Dr. Johnson's therapy sessions were intended to help her cope with being a victim of sexual assault.

Later that same afternoon, Holland met with both Fryberger and Martin. Holland and Fryberger discussed proceeding forward with the University's disciplinary process and whether to

---

[1] Fryberger met with Dr. Johnson four more times on October 27, November 3, December 2, and December 12, 2014.

involve the University's police department. Holland asked Fryberger whether Fryberger felt safe on campus, whether she had any classes with Higgs, and discussed academic accommodations and resources. The parties dispute whether Holland discussed the possibility of a no-contact order and whether Holland discussed the option of changing rooms during that meeting. Holland testified at her deposition that both topics were discussed, but Fryberger testified that she does not recall those topics being discussed. Holland and Fryberger also discussed having a forensic examination of Fryberger performed at a hospital.

At 6:00 pm that evening, EmmaLe Anne Davis, a University victim advocate, drove Fryberger to Willow Creek Women's Hospital. At Willow Creek, a sexual assault examination was performed. Fryberger and Davis then went to the University police station and met with Captain Greg Foster ("Captain Foster")[2] of the University's police department. Captain Foster interviewed Fryberger about the assault. Davis was present during the interview. Captain Foster also provided Fryberger with information for victims of sexual assault, including a Crime Victim Information Sheet with information on victim-assistance programs and counseling services. Captain Foster told Fryberger he intended to speak with Higgs the following day and would instruct Higgs not to contact Fryberger. Captain Foster told Fryberger to contact him if Higgs attempted to contact her. Later that same day, the University's police department searched Fryberger's room for evidence of the assault.

Captain Foster met with Higgs the following day, October 22. Captain Foster questioned Higgs about the night of the assault. Higgs denied sexually assaulting Fryberger. Captain Foster twice instructed Higgs not to contact Fryberger. Neither party disputes the effectiveness of this verbal no-contact order. Higgs directly contacted Fryberger only one time after his discussion

---

[2] In October 2014, Captain Foster was a Lieutenant.

Captain Foster when he attempted to follow Fryberger on a social media platform in May 2015.

On October 22, Melissa Harwood-Rom, Dean of Students and Senior Associate Vice Chancellor for Student Affairs, learned Fryberger had reported a sexual assault. Harwood-Rom instructed her administrative assistant, Marilyn J. Smith, to email Fryberger's professors. Smith's email indicated Fryberger would be absent from classes held on October 22 through October 24.

On October 28, approximately one week after the assault, Fryberger met with Mary Wyandt-Hiebert, Director of the University's Office of Support, Training Advocacy, & Resources. Wyandt-Hiebert discussed various resources available to Fryberger. On October 29, the University's police department concluded its investigation and Captain Foster submitted the findings to the Washington County Prosecutor's Office to determine whether charges should be filed against Higgs.[3]

On November 5, 2014, Fryberger emailed Holland and asked that the University contact her professors about additional absences. Holland forwarded the email to Nicole Ferguson, a case manager in the Dean of Students Office. Ferguson contacted Fryberger's professors the following day as requested and indicated Fryberger was "having some difficulty" and stated they were hopeful "she will be able to work with you and make things up she may have missed."

On November 8, 2014, Julie Fryberger, Elizabeth Fryberger's mother, emailed various University officials, including Wyandt-Hiebert, Holland, Ferguson, and Ashley McNamara, an investigator for the Office of Student Standards and Conduct. According to Julie Fryberger, her daughter intended to return to Colorado on November 10 for an unknown length of time. However, Julie Fryberger was clear Fryberger was not dropping out of school and would be returning at

---

[3] On February 11, 2015, The Washington County Prosecutor's Office notified Captain Foster that no criminal charges would be filed against Higgs.

some point in the future.  Julie indicated Fryberger was "crying too much and everything reminds her of what happened. After all she is still in the same room." (Doc. 42-17, p. 2).  Julie Fryberger inquired about the possibility of changing rooms upon Fryberger's return.

On November 10, 2014, Fryberger returned to Colorado.  Holland responded to Julie Fryberger's email, providing details about changing Fryberger's room and offered to discuss academic accommodations.  Wyandt-Hiebert emailed Fryberger directly to remind her of the University's resources and indicated she would assist Fryberger in a room change.  On November 11, McNamara also emailed Fryberger about changing rooms.  On November 12, Fryberger emailed both Wyandt-Hiebert and McNamara, indicating she considered changing her room a "potential option."  On November 13, Wyandt-Hiebert emailed Fryberger to address concerns Fryberger was having about classes and other resources, and provided assurances that she would assist Fryberger with a victim impact statement that would be submitted to the disciplinary panel reviewing the allegations against Higgs.

On November 17, 2014, Fryberger emailed Holland about changing her room.  Fryberger asked about her living options in the event she returned to school after Thanksgiving.  Fryberger asked, "Would [that] still be the quads?"  Holland indicated Fryberger could move to Maple Hill, a separate residence hall, upon her return.  Holland also told Fryberger there would be other housing options after the Fall semester.  On November 18, Marilyn Smith, Harwood-Rom's assistant, emailed Fryberger's professors inquiring about Fryberger's academics.  Specifically, she sought information concerning Fryberger's status in her classes, course requirements, and options for the semester.  That same day, Wyandt-Hiebert emailed Fryberger and offered to schedule a meeting to address any ongoing questions or concerns.

On November 19, Harwood-Rom convened a meeting with a Critical Incident Response

Team ("CIRT") to assess options to assist Fryberger with her coursework. At that meeting, Harwood-Rom designated Ferguson to serve as the University's primary contact with Fryberger in an effort to simplify the line of communication between Fryberger and the University. The CIRT team also discussed academic accommodations, including the possibility of taking classes remotely and extending time for tests.

In late November, Fryberger retained the services of Laura Dunn, a victim advocate adviser. Fryberger alleges she needed to obtain the services of Dunn because no progress had been made with respect to obtaining accommodations. On November 26, Dunn emailed school administrators, including University Chancellor David Gearhart, requesting "academic and living accommodations" for the semester "that will ensure she is able to continue her education free from any ongoing hostile environment created by this campus sexual assault." Dunn's email suggests Fryberger was still having some difficulty obtaining certain accommodations. Fryberger does not dispute the University eventually provided her with all the accommodations Dunn requested on her behalf.

### C.    The Initial Hearing

Around October 28, 2014, the University's Office of Student Standards and Conduct ("OSSC") began its own investigation of the incident. Ashley McNamara, the investigator for the OSSC, met with Fryberger on November 5, 2014. McNamara interviewed Fryberger as part of the OSSC investigation and offered to have a written no-contact order issued. Fryberger agreed and a written no-contact order was issued and sent to Higgs. The order instructed Higgs to have no contact with Fryberger during the pendency of the disciplinary process and warned that a violation of the order could result in an interim suspension.

The University convened a hearing panel on December 11, 2014, to determine whether

Higgs had violated the University Code of Student Life. The panel included three University employees—Jennifer Conyac, Amanda Bobo, and Chris Bryson. All three employees had been trained to serve on panels adjudicating allegations of student-on-student sexual misconduct. A Title IX hearing packet was provided to each member and included evidence the OSSC had obtained during its investigation. Before the hearing, Rachel Eikenberry, Director of the Office of the OSSC, scheduled separate pre-hearing meetings with both Higgs and Fryberger and provided them with copies of the hearing packet.

In addition to the hearing packet, the panel members also had access to Higgs's prior disciplinary history through an OSSC computer application called "Advocate." Higgs had been involved in three separate incidents during his time at Arkansas prior to the assault. In October 2009, Higgs was involved in a verbal altercation with another male student in a University of Arkansas dining hall. That student was "throwing insults" at Higgs and identified two different females in the dining hall whom he said Higgs "would have sex" with. The argument escalated, and Higgs grabbed a meat carving knife and threatened the other student. The University was notified of this incident and placed Higgs on probation.

In September 2011, Higgs was involved in two separate incidents on the same day. The first incident involved his girlfriend and a group of female students. Higgs and his girlfriend engaged in a heated verbal altercation. There was an allegation that Higgs grabbed his girlfriend, but she later indicated that allegation was false. Later that day, at the Academic Success Center, another student asked Higgs about the earlier altercation. Higgs left the center and removed something from his car. Higgs returned to the center and located the student sitting in a room. Higgs knocked on the room's window to get the student's attention and pointed to his waistband (where the object he removed from his car was apparently situated) and said, "this is for you." The

police were called, and Higgs was placed under arrest.  The University placed Higgs on interim suspension pending a formal review of the incidents and eventually suspended him for the remainder of the 2011 school year.

After reviewing the hearing packet and Higgs's prior disciplinary history, and considering the testimony of both Higgs and Fryberger, the three-person panel unanimously determined Higgs had violated the University policy prohibiting sexual misconduct and harassment.  The panel indicated Higgs's conduct was "highly concerning and a significant threat toward the University community."  The panel recommended Higgs be expelled immediately.

### D.     The Appeal

On December 17, 2014, Higgs filed a formal appeal of the panel's decision.  The University assured Fryberger the no-contact order would remain in effect while the appeal was under consideration. Chancellor G. David Gearhart and Daniel Pugh, Vice Provost for Student and Affairs, considered Higgs's appeal.  Gearhart and Pugh reviewed the entire record before the disciplinary panel.  In a letter dated January 29, 2015, Gearhart and Pugh rendered the University's decision.  The letter, addressed to Higgs, explained that the University upheld the panel's finding of a violation of the Code of Student Life.  However, it represented, "[i]n light of the fact that you had successfully completed your graduation requirements at the University of Arkansas prior to the date of the hearing panel's decision, we do not believe that the imposition of the sanction of immediate expulsion is appropriate in this case." (Doc. 42-54, p. 3).  Rather, the University delayed his expulsion date until May 10, 2015—the day after Higgs would graduate.  The panel's decision meant Higgs would be "prohibited from being on or attending any event on the University of Arkansas campus . . . for a minimum of three (3) years – until May 2018 – or until" Fryberger was no longer enrolled as a student.  (*Id.*).  In essence, the University agreed with the panel's decision

that Higgs sexually assaulted Fryberger, but it delayed his expulsion date until after he graduated. Both Chancellor Gearhart and Vice Provost Pugh signed the letter.

On January 30, 2015, the University provided Fryberger with an electronic notice of its decision (the "notice") through the University's online student portal. The notice reflected the University upheld the panel's finding of a Code violation. However, the notice omitted certain details of Higgs's punishment. Though the notice represented the University "[u]pheld the sanction of Expulsion," it made no mention of the decision to delay the expulsion until May 10, 2015. Additionally, though the notice indicated Higgs was "not allowed on university of Arkansas property for a minimum of 3 years," it omitted any reference to the May 2018 date.

On February 2, 2015, Dunn wrote to Rachel Eikenberry seeking clarification of the notice sent to Fryberger. In particular, Dunn inquired about the details of Higgs's expulsion, including whether it was retroactive to the date of the offense, and inquired about whether the appeal had a proper basis. To that point, the only information Fryberger had received with respect to Higgs's suspension was the electronic notice. The additional information, according to Dunn, was therefore "essential to provide the full notification to the victim in this case regarding the sanction imposed." (Doc. 52-4, pp. 221-22). Tamla Lewis, an Associate General Counsel to the University, responded to Dunn's letter and wrote, "[The effective date of the expulsion] is May 10, 2015. While you stated you requested to Ms. Eikenberry that the expulsion be made retroactive to the date of the alleged offense, the University was under no federal mandate to do so." (*Id.* at pp. 237-38). Lewis also noted that "the appellate body took into consideration the record as a whole and, after a very careful review, reached its decision." (*Id.*).

On February 10, 2015, the University issued an updated decision letter sent to Higgs and transmitted an updated decision notice to Fryberger. Chancellor Gearhart signed the updated

decision letter to Higgs. The updated notice to Fryberger claimed that the January 29 letter had been sent in error and was based on an incorrect version of an appeal decision which had not been approved by Chancellor Gearhart. The updated decision reflected that Higgs was "expelled effective December 11, 2014." The University still maintains that the January 29 letter was sent in error. Fryberger alleges the decision communicated in the first letter to Higgs confused her, impacted her mental health, and caused her to question whether Higgs was still allowed on campus.

Fryberger eventually withdrew from three courses in the Spring 2015 semester. However, she completed two courses and finished the Spring 2015 semester at the University of Arkansas. Fryberger did not return to campus the following year. She filed the instant action against the University of Arkansas and the University's Board of Trustees alleging that the University violated Title IX both before and after she was sexually assaulted. Specifically, she alleges that the University had notice prior to October 20, 2014 that Higgs had a propensity for gendered-based peer-harassment, was deliberately indifferent to that knowledge, and that deliberate indifference subjected Fryberger to the original sexual assault. Fryberger also alleges that after the assault, the University was deliberately indifferent in its response to her report of sexual assault. The University filed a motion for summary judgment on all claims, alleging that it did not violate Title IX at any point before or after the sexual assault. The parties have separated Fryberger's claims into a "pre-assault" claim and a "post-assault" claim. The Court will address both claims in turn, addressing first the "pre-assault" claim, and then turning to the "post-assault" claim.

## II.     Summary Judgment Standard

When a party moves for summary judgment, the party must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). Only facts "that might affect the outcome of the suit under the governing law" need be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001). Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Id.* at 656–57. In order for there to be a genuine issue of material fact, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (citing *Anderson*, 477 U.S. at 248).

## III.   Analysis

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX provides an implied private cause of action for an individual claiming injury due to an educational institution's unlawful sex discrimination, and that the claimant may sue the institution for damages and obtain relief. *See Pearson v. Logan Univ.*, 937 F.3d 1119, 1124-25 (8th Cir. 2019) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 716-17 (1979); *Fryberger v Univ. of Ark.*, 889 F.3d 471, 475 (8th Cir. 2018)).[4] However, the Supreme Court has made clear that a recipient of federal funds is liable only for its own misconduct. *Davis v. Monroe Cty. Bd. of Educ.*, 526

---

[4] Despite clear case law to the contrary, the University originally argued in this case that it had sovereign immunity from claims under Title IX.

U.S. 629, 640 (1999). An educational institution is liable only when the school "itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent" to acts of discrimination of which it had actual knowledge. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). "[A] recipient's deliberate indifference to sexual harassment of a student by another student . . . squarely constitutes discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (quoting Davis, 526 U.S. at 643) (internal quotations omitted).

Thus, "[t]o succeed on a Title IX claim based on harassment by another student, a plaintiff must show that the educational institution was (1) deliberately indifferent (2) to known acts of discrimination (3) which occurred under its control." *Pearson*, 937 F.3d at 1125 (internal alternations and citations omitted). The bar for deliberate indifference is intentionally high to afford school administrators with "the flexibility they require" to exercise disciplinary authority. *Davis*, 526 U.S. at 648. A court should therefore refrain from second guessing the disciplinary decisions made by school administrators. *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (quoting *Davis*, 526 U.S. at 648). "Deliberate indifference is a stringent standard of fault that cannot be predicated upon mere negligence." *Id.* (quoting *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010)). Rather, "[a] school is deliberately indifferent when its 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (quoting *Davis*, 526 U.S. at 648). "[D]eliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645 (internal quotations omitted). Furthermore, a Title IX plaintiff must also establish that the alleged harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the educational

opportunities or benefits provided by the school." *Id.* at 650. In an appropriate case, a court may rule as a matter of law that a response is not clearly unreasonable. *Id.* at 649.

### A. Pre-Assault Claims

The University argues that Fryberger's pre-assault claim should be dismissed because the University had no prior knowledge that Higgs sexually assaulted another person before he assaulted Fryberger. Fryberger contends the University need not have knowledge that Higgs committed a previous sexual assault, but that the University's knowledge of Higgs's disciplinary history—which demonstrates an alleged propensity for "gendered violence"—is sufficient to satisfy the actual knowledge requirement. The Court is not convinced that Higgs's prior disciplinary issues are sufficient to put the University on notice of "known acts of discrimination." Though each of the previous incidents all involved some level of violence, there is little that would notify a reasonable person that Higgs had a predisposition for gender-based violence, such as a sexual assault. However, even assuming the University's knowledge of Higgs's disciplinary history was sufficient to put the University on such notice, Fryberger has failed to demonstrate the University was deliberately indifferent before the assault.

Fryberger argues that the University should not have allowed Higgs to return to campus following his earlier disciplinary issues. However, the University investigated each incident and responded with various sanctions. The University placed Higgs on probation after the first incident. Following the second and third incidents in September 2011, the University placed Higgs on interim suspension and eventually suspended him for the remainder of the 2011 school year. Fryberger argues these sanctions were meaningless and had little effect.[5] The law is clear the

---

[5] Specifically, Fryberger argues probation had little effect because it merely meant Higgs was prohibited from participating in leadership and study abroad activities. Additionally,

Court's job is not to second-guess the disciplinary measures imposed by a school. *Dardanelle Sch. Dist.*, 928 F.3d at 725. The University investigated each incident and responded with a sanction it deemed appropriate. Furthermore, the sexual assault against Fryberger occurred more than two years after Higgs's previous suspension. Whether or not that sanction was in fact appropriate, there is no dispute whether the University in good faith believed it was appropriate. The University was not deliberately indifferent to any known risk posed by Higgs prior to his assault of Fryberger.[6]

Because Fryberger fails to demonstrate the University acted with deliberate indifference to Higgs's prior disciplinary history, her pre-assault claims will be dismissed.

### B.    Post-Assault Claims

#### 1.    Deliberate Indifference

The University argues its response to Fryberger's report of sexual assault was not objectively unreasonable and therefore not deliberately indifferent.[7] The complaint includes numerous allegations with respect to how the University acted with deliberate indifference after

Fryberger argues Higgs's suspension "meant that Higgs was allowed time to go to the Bahamas to continue his Olympics training before returning to campus." (Doc. 55, p. 2, ¶ 4).

[6] Fryberger also argues the University was deliberately indifferent by failing to monitor Higgs's whereabouts and failing to restrict his access to certain University buildings after he returned to campus. She also alleges the University should have notified her of Higgs's disciplinary history. Fryberger offers no precedent of a public university being subject to damages for failing to impose similar measures, and the Court has found none. Each of these alleged deficiencies would impose a significant burden on universities that regularly accommodate thousands of students. In the absence of established precedent, the Court finds the University's actions in this respect were not clearly unreasonable. *Maher*, 915 F.3d at 1213.

[7] Actually, the University first argues her post-assault claims must be dismissed because it did not ignore Fryberger's report of sexual assault. This is a misstatement of the applicable law. The Supreme Court has made clear that a University need not ignore a report of harassment to expose it to liability. *See Davis*, 526 U.S. at 648 (stating a recipient of federal funds is liable for its own conduct when its "*response to the harassment or lack thereof* is clearly unreasonable in light of the known circumstances" (emphasis added)). In this case, Fryberger alleges the University responded, but did so in a deliberately indifferent manner.

Fryberger reported the assault. After reviewing the summary judgment briefs and the accompanying exhibits, and after considering both parties' arguments at the motion hearing, it appears many of these allegations may be dismissed as a matter of law. There is no factual basis to support Fryberger's argument that the women's tennis team's response was clearly unreasonable. Nor are there facts to demonstrate the actions of the team's employees subjected Fryberger to gender-based discrimination. Finally, there are no facts to support the argument that the University's athletic policies were inadequate or nonexistent. Because no reasonable juror could find for Fryberger on those claims, they will be dismissed. *See Allison* 28 F.3d at 66–67.

Therefore, the only post-assault allegations that remain pending for consideration are: (1) that the University was deliberately indifferent when it allowed Higgs to remain on campus during the investigation; (2) that the University's failure to offer academic and living accommodations was deliberately indifferent; and (3) that the University was deliberately indifferent in its handling of Higgs's appeal. The Court will handle each of these remaining allegations in turn.

With respect to the first remaining allegation, Fryberger alleges the University was deliberately indifferent in allowing Higgs to remain on campus during its investigation, rather than imposing an interim suspension. Higgs originally denied assaulting Fryberger. Imposing an interim suspension without a proper investigation may have implicated Higgs's due process protections. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399-400 (6th Cir. 2017). Instead of a suspension, the University imposed safeguards to mitigate the possibility Fryberger would encounter Higgs and to ensure Fryberger felt safe on campus. Captain Foster imposed a verbal no-contact order immediately after the assault occurred, Fryberger knew of the no-contact order, and there is no dispute Captain Foster's no-contact order was effective. Although Monica Holland did not immediately impose a no-contact order after the assault, and the parties dispute whether

one was discussed at the October 22 meeting, the University benefits from Captain Foster's good judgment in imposing a no-contact order on Higgs. However, Holland asked Fryberger whether she had any activities with Higgs and whether she felt safe on campus. The University issued a written no-contact order after McNamara's discussion with Fryberger on November 5, and the University was clear that the no-contact order would remain in effect during Higgs's appeal. The University took good faith steps before and during the investigation to ensure Fryberger would have no further contact with Higgs. Allowing Higgs to remain on campus during the investigation was not clearly unreasonable.

With respect to the second remaining allegation, Fryberger alleges the University was deliberately indifferent when it failed to timely provide her with housing and academic accommodations. Fryberger alleges the process for obtaining accommodations was systematically flawed, and she questions the University's willingness to actually provide accommodations. The University contends that because it eventually provided Fryberger with all the accommodations she requested, it could not have been deliberately indifferent as a matter of law. To the extent Fryberger argues the University's process for obtaining accommodations was systematically flawed, her argument appears more akin to one of negligence which is insufficient to state a claim under Title IX. *See Davis*, 526 U.S. at 648.

Though the University timely discussed accommodations with Fryberger, it provided no accommodations until she obtained the services of Laura Dunn. The University argues it provided all the accommodations she requested through Dunn—the implication being that it provided no accommodations until a month after the assault, at the earliest. The University's argument that eventually providing all accommodations absolved the University of allegations of deliberate indifference is undermined by the fact that Fryberger felt compelled to return home midsemester—

*after* meeting with both Holland and Wyandt-Hiebert but *before* obtaining Dunn's assistance. The fact Fryberger felt it necessary to seek Dunn's assistance at all supports her contention no progress had been made to that point. These facts alone may be sufficient to submit this question to the jury. However, deliberate indifference is an exacting standard and it cannot be predicated upon mere negligence. *Id.* at 648. That being case, the Court will reserve judgment on this matter until it discusses the University's handling of Higgs's appeal.

Fryberger's final allegation contends the University acted deliberately indifferent when it issued the first letter delaying the effective date of Higgs's suspension until May 10, 2015—the day after Higgs's graduation.[8] It is undisputed that the January 29 letter affirmed the disciplinary panel's factual finding that Higgs's violated the Code of Student Life. However, it is also undisputed that the letter communicated that the University believed immediate expulsion was not an appropriate sanction. The University modified the panel's decision with respect to the sanction and delayed the effective date of Higgs's expulsion more than four months so that it became effective only *after* Higgs graduated. The letter further suggests Higgs's ban from campus became effective in May 2015. A reasonable jury could easily find that delaying expulsion until after graduation is not expulsion at all, and so find that the University ultimately took no action after finding Fryberger was sexually assaulted. However, in addition to the January 29 letter to Higgs, the Court is concerned with the notice to Fryberger which outlined the appeal resolution, as that notice appears to be misleading.

---

[8] Fryberger also alleges certain procedures associated with the appeal demonstrated gender-based discrimination. There is nothing in the record which would suggest the procedures employed before and during the proceeding subjected Fryberger to such discrimination. Because no reasonable juror could find for Fryberger with respect to those arguments, they will be dismissed. *See Allison* 28 F.3d at 66–67.

The original notice reflected the panel's finding of a Code violation had been affirmed. The notice also indicated Higgs was not allowed on campus for three years. However, the notice made no mention of the modification to the expulsion date. Fryberger only learned of the modification to Higgs's expulsion date by virtue of Tamala Lewis's letter which confirmed that the University intended the modification communicated in the January 29 letter. A reasonable jury could conclude that the first letter was not sent in error and the University originally decided to allow Higgs to remain on campus until he graduated. A reasonable jury could further conclude that the University intentionally withheld knowledge of that decision from Fryberger. At the time of the appeal, the University was aware of the difficulties Fryberger had endured following the assault—she had already returned home midsemester and expressed to various University administrators her difficulties coping with the assault. The Court finds a reasonable jury could conclude the University was deliberately indifferent in issuing the original letter and notice. This is not a situation where a plaintiff complains of an administrator's disciplinary decision, as the University suggests. The issue is not with the ultimate decision of the appeal—that decision favors Fryberger. The problem is instead with the University's handling of the appeal and the contents of its original decision and subsequent communications with Fryberger.[9]

In light of the misleading nature of the notice to Fryberger, fact questions remain with respect to whether the University's actions in providing post-assault accommodations reveal actionable deliberate indifference. The notice supports an inference the University disregarded

---

[9] The University's claim the first letter to Higgs was sent in error cannot change the Court's decision. This argument appears to be in direct conflict with the facts, specifically Tamla Lewis's letter to Laura Dunn validating that decision. Even if it were sent in error, the Court is not convinced a mistake would foreclose liability. The misleading nature of the notice itself would allow a reasonable jury to determine the University's handling of the appeal was clearly unreasonable.

Fryberger's well-being by withholding the fact it modified Higgs's expulsion date. The Court finds this inference is sufficient to put the good faith of the University's earlier actions in providing accommodations into dispute. Because a reasonable jury could find the University was deliberately indifferent in these respects, the University's motion will be denied on its deliberate indifference arguments.

### 2.     Causation

The University next argues any alleged deliberate indifference did not cause Higgs to sexually assault Fryberger a second time, which the University claims is a necessary component of Fryberger's Title IX claim. As it has done throughout this case, the University misstates a Title IX standard. "[D]eliberate indifference must, at a minimum, cause students to undergo harassment *or make them liable or vulnerable to it*." *Davis*, 526 U.S. at 645 (internal quotations omitted) (emphasis added); *see also Takla v. Regents of the Univ. of California*, No. 2:15-cv-04418, 2015 WL 6755190, at *5 (C.D. Ca. Nov. 2, 2015) ("[P]lacing an undue emphasis on whether further harassment actually occurred to gauge the responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending environment."). The Tenth Circuit discussed this issue at length. *See Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1104 (10th Cir. 2019). Relying on *Davis*, the Tenth Circuit determined a plaintiff "can state a viable Title IX claim for student-on-student harassment by alleging that the funding recipient's deliberate indifference caused them to be 'vulnerable to' further harassment without an allegation of subsequent actual sexual harassment." *Id.* Fryberger therefore need not allege a second assault to demonstrate she was vulnerable to further harassment.

Fryberger testified she was unsure whether Higgs was expelled from the University of Arkansas. As a result, Fryberger suffered from a deteriorating mental state and she suggested she

feared encountering Higgs. A victim may be vulnerable to harassment based on her depression and fear of encountering the assailant on campus. *See Doe 1 v. Howard Univ.*, 396 F.Supp.3d 126, 138 (D.D.C. 2019) (finding plaintiff's allegations that "she felt depressed and constantly fearful of encountering her rapist on campus" sufficient to demonstrate she was vulnerable to future harassment). However, an alleged fear of encountering assailant must be objectively reasonable. *Farmer*, 918 F.3d at 1104. The University argues that the second letter cured any such possibility that Fryberger would encounter Higgs because the second letter affirmed Higgs's immediate expulsion. As a result, according to the University, Fryberger had nothing to fear after it issued the second letter. The Court disagrees. Fryberger testified as to the heavy toll the University's actions took on her mental health. Based on misleading nature of the original notice sent to Fryberger, which arguably was not sent in error per Tamala Lewis's letter, and based on the University's arguable reluctance to provide accommodations, a jury could find it was reasonable for Fryberger to question whether Higgs was in fact expelled, even after the second letter.

Additionally, Julie Fryberger's November 8 email indicated Fryberger would be returning to Colorado because she was still living in the room where she was assaulted. A reasonable jury could find that by allowing Fryberger to remain in her room, whether by failing to offer an alternative or refusing to provide other accommodations, the University, at the very least, contributed to her debilitating mental state and therefore made her vulnerable to further harassment. *Doe 1 v. Howard Univ.*, 396 F.3d at 138. The parties dispute whether Holland discussed living accommodations with Fryberger at the October 21 meeting. The University argues any dispute is immaterial because Fryberger's November 12 email represented that she considered a room change a "potential" option. Fryberger's mindset after she returned home is not dispositive as to her thoughts before November 10. Any alleged inconsistency in these facts

requires a credibility determination. The Court finds a factual dispute exists with respect to whether the University's deliberate indifference in failing to provide accommodations made Fryberger vulnerable to further harassment.

### 3. Severe, Pervasive, and Objectively Offensive Harassment

The University's final argument is that in order to show "pervasive" and "severe" harassment, a plaintiff "must typically show that she was sexually assaulted by the perpetrator on more than one occasion." (Doc. 44, pp. 7, 19). As discussed above, this is another incorrect statement of the law and this argument warrants little discussion. *Farmer*, 918 F.3d at 1104. The post-assault Title IX violation about which Fryberger complains is not the sexual assault itself. Fryberger complains of the inadequacies in the University's response to her report of that assault. Fryberger need not show she was sexually assaulted on a subsequent occasion. Rather, she must demonstrate the University's response left her vulnerable to further harassment that was so severe, pervasive, and objectively offensive it deprived her of access to the educational opportunities or benefits provided by the University. *Davis*, 526 U.S. at 650; *Farmer* 918 F.3d at 1105.

Fryberger left the University of Arkansas midsemester and returned to Colorado on November 10. Though she returned and completed the Spring 2015 semester, Fryberger was forced to drop a few of her classes that semester. Fryberger alleges her grades suffered, and she was forced to miss a significant number of classes because of her fear and depression. This all culminated in Fryberger eventually leaving the University of Arkansas following the Spring 2015 semester. The ultimate question for the jury is whether the University's deliberate indifference following Fryberger's report of sexual assault left her with an objectively reasonable belief that she remained vulnerable to harassment so severe, pervasive, and offensive that it deprived her of equal access to the educational benefits and opportunities provided by the University. Because a

reasonable jury could make such a finding, the University's motion for summary judgment will be denied.

**IV.     Conclusion**

IT IS THEREFORE ORDERED that University's motion for summary judgment (Doc. 42) is GRANTED IN PART and DENIED IN PART.   The motion is granted with respect to Fryberger's Title IX pre-assault claims.  Fryberger's Title IX post-assault claims remain pending for trial as stated herein.  A trial date will be entered by separate order.

IT IS SO ORDERED this 18th day of November, 2019.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE